## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BELLE COHEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID A. BRANDON, STEPHEN G. | ) |
| PAGLIUCA, BAIN CAPITAL PARTNERS, | ) |
| BAIN CAPITAL, LLC, JOHN W. CHIDSEY, | ) |
| BRIAN T. SWETTE, RICHARD W. BOYCE, | ) |
| RONALD M. DYKES, PETER R. FORMANEK, | ) |
| MANUEL GARCIA, SANJEEV K. MEHRA, | ) |
| and KNEELAND C. YOUNGBLOOD, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and, | ) |
| | ) |
| BURGER KING HOLDINGS, INC., | ) |
| | ) |
| Nominal Defendant. | ) |
| | ) |

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff brings this action derivatively, pursuant to Fed. R. Civ. P. 23.1, on behalf of

Burger King Holdings, Inc. ("Burger King" or the "Company"), for injunctive relief against

Defendants and makes his allegations based upon personal knowledge as to himself and on

information and belief as to all other matters based upon the investigation of his counsel, which

included a review of filings with the Securities and Exchange Commission (the "SEC"),

conference call transcripts with analysts, news items and other public information.  Plaintiff

believes that further evidence will be forthcoming upon a reasonable opportunity for discovery.

## NATURE OF ACTION

1. Plaintiff brings this action to enjoin defendants' continued violation of the

prohibition of "interlocking directorships," under Section 8 of the Clayton Act, 15 U.S.C. § 19

("Section 8").  Section 8 prohibits a person from serving as a director or officer of two or more

corporations if: (a) the combined capital, surplus and undivided profits of each of the

corporations exceeds $25,841,000;[1] (b) each corporation is engaged in commerce; and (c) the

corporations are competitors with certain threshold competitive annual sales.  Although the

statute contains some exemptions, none apply here.[2]  The statute is designed to prohibit

competing organizations from sharing officers or directors, because of the high likelihood that

the organizations will not compete with one another, or not compete aggressively.

2.      Burger King is in the quick service restaurant ("QSR") business segment, *i.e.*, fast

food.  *See* Burger King 2008 Annual Report at 3 (Form 10-K, filed with the SEC on or about

Aug. 27, 2009) ("Burger King 2008 10-K").  As of June 30, 2009, the Company had 11,925

restaurants in 73 countries and U.S. territories.  *Id.*  The Company competes with, among others,

Domino's Pizza, Inc. ("Domino's"), which reported having 8,773 stores worldwide in more than

60 countries for year-end 2008.  *See* Domino's 2008 Annual Report at 2 (Form 10-K, filed with

the SEC on or about Feb. 24, 2009) ("Domino's 2008 10-K").

3.      Both Burger King and Domino's are in the QSR business segment and thus

---

[1]  This statutory threshold is a measure of a corporation's net worth and is adjusted every year as determined by the Department of Commerce and published by the Federal Trade Commission (the "FTC").  15 U.S.C. § 19(a)(5).  On January 19, 2010, the FTC announced this new threshold amount.

[2]  Exempted from Section 8's prohibitions are interlocks for which: (1) the competitive sales of either corporation are less than $1 million (or as of January 19, 2010: $2,584,100); (2) the competitive sales of either corporation are less than 2 percent of that corporation's total sales; or, (3) the competitive sales of each corporation are less than 4 percent of that corporation's total sales.  15 U.S.C. § 19(a)(2)(A)-(C).  The term "competitive sales" is defined as "the gross revenues for all products and services sold by one corporation in competition with the other, determined on the basis of annual gross revenues for such products and services in that corporation's last completed fiscal year" and the term "total sales" means "the gross revenues for all products and services sold by one corporation over that corporation's last completed fiscal year."  15 U.S.C. § 19(a)(2).  As explained herein, none of these exemptions apply in this action.

compete with one another for QSR customers. Indeed, Domino's is one of the companies listed by Burger King in its public filings as a "peer company" in the "Hotels, Restaurants & Leisure" category. *See* 2009 Proxy Statement at 17-18 (Form DEF-14A, filed with the SEC on or about Nov. 8, 2009) ("Burger King 2009 Proxy"). And according to QSR Magazine's list of the 50 largest QSRs for 2009 (based on 2008 sales), Burger King was ranked third and Domino's was ranked thirteenth.

      4.      Serving on Burger King's Board of Directors (the "Board") and on the board of Domino's are David A. Brandon ("Brandon") and Stephen G. Pagliuca ("Pagliuca"), interlocking directors within the meaning of Section 8.

      5.      This action is brought derivatively on behalf of Burger King to enforce Section 8 and enjoin these illegal interlocks. A pre-suit demand on the Board is futile and excused. Nominating and allowing Brandon and Pagliuca to serve on the Board was an illegal, void and *ultra vires* act by the Board. A majority of the current Board nominated Brandon for continued Board membership in 2009 and recommended that shareholders vote for him, in violation of Section 8. In addition, the entire Board appointed Pagliuca (as the designated agent of Bain, defined below) to the Board in January 2010, in violation of Section 8. Because a majority of the current Board committed these void and *ultra vires* acts, a pre-suit demand on the current Board would be futile and is excused.

## JURISDICTION AND VENUE

      6.      This Court has jurisdiction of this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 8 of the Clayton Act, 15 U.S.C. § 19. The Court has supplemental jurisdiction over Plaintiff's state-law claim alleged in Count Two.

      7.      Original jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1337. The Court also has supplemental jurisdiction over Plaintiff's state-law claim pursuant to

28 U.S.C. § 1367.

8.    Venue is laid in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.
Burger King maintains its headquarters in this District.

## PARTIES

9.    Plaintiff is, and has been at all relevant times, a shareholder of Burger King.

10.    Nominal Defendant Burger King is a Delaware corporation with headquarters
located at 5505 Blue Lagoon Drive, Miami, Florida 33126.

11.    Defendant David A. Brandon ("Brandon") has been a Director of the Company
since September 2003.  Brandon is also Chairman and Chief Executive Officer of Domino's,
positions which he has held since 1999.  On January 5, 2010, the Company announced that
Brandon will be stepping down as Chief Executive, effective March 7, 2010, but remaining on
the Domino's Board as Chairman.  Brandon is a member of the Nominating and Corporate
Governance Committee.

12.    Defendant Stephen G. Pagliuca ("Pagliuca") served as a Director of the Company
from December 2002 until his resignation, effective September 21, 2009.  Pagliuca resigned
from the Board due to his decision to run for the Massachusetts U.S. Senate seat of Edward M.
Kennedy, which Pagliuca did not obtain.  As a result of Pagliuca's resignation, there was a
vacancy on the Company's Board that, according to the Burger King 2009 Proxy, would be filled
by Bain Capital Partners pursuant to a Shareholders' Agreement, dated June 27, 2003, which was
amended and restated on May 17, 2006 (the "Shareholders' Agreement").  On January 20, 2010,
the Burger King Board, upon the recommendation of the Nominating and Corporate Governance
Committee, reappointed Pagliuca as a director to fill the vacancy created by his resignation.
According to a Form 8-K filed by the Company with the SEC on January 25, 2010, Pagliuca was
selected as a director by Bain pursuant to the Shareholders' Agreement.  Pagliuca is a Managing

Director at Bain. Pagliuca is Chairperson of the Compensation Committee.

13.    Defendants Bain Capital Partners and Bain Capital, LLC (collectively, "Bain")
are located at 111 Huntington Avenue, Boston MA 02199.  Bain is a private equity and venture
capital firm with roughly $65 billion in holdings.  Among others, Bain has controlling interests
in both Burger King and Domino's.  Certain private equity funds controlled by Bain Capital
Partners, TPG Capital and Goldman Sachs Funds own approximately 32% of the common stock
of Burger King.  Investment funds associated with Bain Capital, LLC together beneficially own
approximately 30% of the common stock of Domino's. Pursuant to its interests in both Burger
King and Domino's, Bain is authorized to and appoints its deputies, agents and designees to sit
on the boards of both Burger King and Domino's.  Andrew B. Balson ("Balson") and Mark  E.
Nunnelly ("Nunnelly") are Managing Directors of Bain and members of the Domino's Board of
Directors (the "Domino's Board") as deputies, agents and designees of Bain.  Balson has been on
the Domino's Board since March 1999 and serves on the Domino's Board's Nominating and
Corporate Governance Committee.  Balson previously served on the Burger King Board.
Nunnelly has been on the Domino's Board since December 1998 and serves on the Domino's
Board's Compensation Committee.

14.    Defendant John W. Chidsey ("Chidsey") has been the Chief Executive Officer
and a Director of the Company since April 2006.  In July 2008, Chidsey became Executive
Chairman of the Company.  Chidsey is a member of the Executive Committee.

15.    Defendant Brian T. Swette ("Swette") has been a Director of the Company since
April 2003.

16.    Defendant Richard W. Boyce ("Boyce") has been a Director of the Company
since December 2002.  Boyce is Chairperson of the Executive Committee.

17.    Defendant Ronald M. Dykes ("Dykes") has been a Director of the Company since

April 2007. Dykes is Chairperson of the Audit Committee.

18.     Defendant Peter R. Formanek ("Formanek") has been a Director of the Company since September 2003. Formanek is a member of the Audit and Compensation Committees.

19.     Defendant Manuel Garcia ("Garcia") has been a Director of the Company since September 2003. Garcia is a member of the Audit Committee.

20.     Defendant Sanjeev K. Mehra ("Mehra") has been a Director of the Company since December 2002. Mehra is Chairperson of the Nominating and Corporate Governance Committee and a member of the Compensation and Executive Committees.

21.     Defendant Kneeland C. Youngblood ("Youngblood") has been a Director of the Company since October 2004.

22.     The term "Director Defendants" refers to Defendants Brandon, Pagliuca, Chidsey, Swette, Boyce, Dykes, Formanek, Garcia, Mehra and Youngblood.

## SUBSTANTIVE ALLEGATIONS

### A.     Burger King Competes With Domino's

23.     Burger King and Domino's both describe themselves as QSRs, sell similar types of sandwiches, fried chicken pieces, salads, desserts and beverages, all nationwide and at comparable prices. Burger King considers Domino's a "peer" and prohibits its executives from working at Domino's and other QSRs during or following their employment at Burger King. Burger King and Domino's are both regarded by the industry as competitors in the QSR business segment. At least one stock analyst recently described the two companies as competitors.

24.     QSR magazine and its web site QSRmagazine.com, which provide news and information about the $180+ billion QSR industry, have an annual ranking of the QSR industry. Below are the top twenty (20) entities in QSR Magazine's list of the top 50 QSRs for 2009 (based on 2008 sales):

| Rank | QSR |
|------|-----|
| 1 | McDonald's |
| 2 | Subway |
| 3 | Burger King |
| 4 | Starbucks Coffee |
| 5 | Wendy's |
| 6 | Taco Bell |
| 7 | Pizza Hut |
| 8 | Dunkin' Donuts |
| 9 | KFC |
| 10 | Sonic |
| 11 | Arby's |
| 12 | Jack In The Box |
| 13 | Domino's |
| 14 | Chick-fil-A |
| 15 | Panera Bread |
| 16 | Dairy Queen |
| 17 | Papa John's |
| 18 | Hardee's |
| 19 | Quiznos Subs |
| 20 | Popeyes |

**1.     Burger King**

25.     The combined capital, surplus and undivided profits of Burger King exceeds $25,841,000.  Burger King engages in commerce.  Burger King is in the QSR (*i.e.*, fast food) business.

26.     In December 2002, Burger King's predecessor was acquired by private equity funds controlled by Bain Capital Partners, TPG Capital and the Goldman Sachs Funds (Burger King's "Sponsors").  *See* Burger King 2008 10-K at 3.  In May 2006, Burger King consummated its initial public offering.  *Id.*  The private equity funds controlled by the Sponsors currently own approximately 32% of Burger King's outstanding common stock.  *Id.*

27.     For the year ended June 30, 2009, Burger King reported revenues of over $2.5 billion.  *Id.* at 39.  The "competitive sales" of Burger King, as that term is defined by Section 8

and as described herein, exceed the statutory minimums of that statute.

28.     Burger King derives substantial revenue from the sale of sandwiches.  According to its 2008 Annual Report: "Our restaurants feature flame-broiled hamburgers, chicken and other specialty sandwiches, french fries, soft drinks and other affordably-priced food items."  Burger King 2008 10-K at 3.

29.     The sandwiches sold by Burger King include, among others: Whopper; Double Whopper; Triple Whopper; Whopper Jr.; BK Double Stacker; BK Triple Stacker; BK Quad Stacker; Steakhouse Burger; Steakhouse XT Burger; BK Burger Shots; Hamburger; Double Hamburger; Cheeseburger; Double Cheeseburger; Tendercrisp Chicken Sandwich; Spicy Chick'n Crisp Sandwich; Tendergrill Chicken Sandwich; Original Chicken Sandwich; BK Veggie Burger; and, BK Big Fish.  Burger King also sells an assortment of fried chicken pieces, salads, desserts and beverages.  A listing of the items sold by the Company are available on its website at www.bk.com.

30.     Burger King sells the items listed above at prices similar to Domino's for these type of items.  For example, in the United States, Burger King sells a variety of it smaller-sized sandwiches, fried chicken pieces, salad, dessert and beverages (available on its BK Value Menu) for $1.  While prices vary based on geographical location, Burger King also sells in the United States its standard-sized items at the following prices: (i) $6 to $7 for its chicken and fish sandwiches; (ii) $5 to $6 for a salad; (iii) $5 to $6 for a variety of fried chicken pieces; (iv) $1 to $2 for deserts; and (v) $1 to $3 for a variety of carbonated and non-carbonated beverages.

31.     Several executive employment agreements, filed as attachments to Burger King's 2008 Annual Report, contain non-compete clauses which prohibit executives from working for competitors in the "quick service restaurant business."  One such employment agreement, between Burger King and Defendant Chidsey contains the following clause:

> Non-Competition. . . . Executive agrees that during his employment with the Company and for the period of one (1) year following Executive's Separation from Service with the Company, Executive shall not directly or indirectly engage in any activities that are competitive with any business conducted by the Company and Executive shall not, directly or indirectly, become employed by, render services for, engage in business with, serve as an agent or consultant to, or become a partner, member, principal, stockholder or other owner of, any Person or entity that engages in the ***quick serve restaurant business***, <u>provided</u> that Executive shall be permitted to hold a one percent (1%) or less interest in the equity or debt securities of any publicly traded company.

Burger King 2008 10-K, Ex. 10.51 at 10 (emphasis added). Other executive employment agreements, such as the following one for Charles Fallon, the Company's President for North America, contain similar non-compete language as follows:

> Non-Competition. . . . Executive further agrees that during his employment with the Company and for the period of one (1) year following Executive's Separation from Service with the Company, Executive shall not directly or indirectly engage in any activities that are ***competitive with the quick service restaurant business*** conducted by the Company, and Executive shall not, directly or indirectly, become employed by, render services for, engage in business with, serve as an agent or consultant to, or become a partner, member, principal, stockholder or other owner of, any Person or entity that engages in the ***quick serve restaurant business***, provided that Executive shall be permitted to hold a one percent (1%) or less interest in the equity or debt securities of any publicly traded company. . . .

Burger King 2008 10-K, Ex. 10.52 at 11 (emphasis added).

32. Burger King considers Domino's a competitor. In its public filings, Burger King lists ten (10) peer companies in the "Hotels, Restaurants & Leisure" category. 2009 Proxy Statement at 17-18. One of the companies listed is "Domino's." *Id.*

33. The Company's Annual Report for 2008, under the heading "Competition," states as follows:

> We operate in the FFHR [fast food hamburger restaurant] category of the QSR [quick service restaurant] segment within the broader restaurant industry. Our two main domestic competitors in the FFHR category are McDonald's Corporation, or McDonald's, and Wendy's/Arby's Group, Inc., or Wendy's. To a lesser degree, ***we compete against national food service businesses offering alternative menus, such as Subway, Yum! Brands, Inc.'s Taco Bell, Pizza Hut and Kentucky Fried Chicken,*** casual restaurant chains, such as Applebee's, Chili's, Ruby Tuesday's and "fast casual" restaurant chains, such as Panera Bread, as well as convenience

stores and grocery stores that offer menu items comparable to that of *Burger King* restaurants. We compete on the basis of product choice, quality, affordability, service and location.

Our largest U.S. competitor, McDonald's, has significant international operations. ***Non-FFHR based chains, such as KFC and Pizza Hut, have many outlets in international markets that compete with Burger King and other FFHR chains.*** In addition, *Burger King* restaurants compete internationally against local FFHR chains, sandwich shops, bakeries and single-store locations.

Burger King 2008 10-K at 15 (emphasis added).

    **2.**     **Domino's**

34.    The combined capital, surplus and undivided profits of Domino's exceeds $25,841,000. Domino's engages in commerce. Domino's is in the QSR (*i.e.*, fast food) business.

35.    Domino's is a Delaware corporation with headquarters located at 30 Frank Lloyd Wright Drive, Ann Arbor, Michigan 48105.

36.    In 1998, an investor group led by investment funds associated with Bain Capital, LLC completed a recapitalization through which the investor group acquired a 93% controlling economic interest in Domino's from Thomas Monaghan and his family. *See* Domino's 2008 10-K at 3. At the time of the recapitalization, Mr. Monaghan retired. *Id.* In 2004, Domino's completed its initial public offering. *Id.* The Investment funds associated with Bain Capital, LLC together beneficially own approximately 30% of the common stock of Domino's. *Id.* at 21.

37.    For the year ended 2008, Domino's reported revenues of over $1.4 billion. *Id.* at 25. The "competitive sales" of Domino's, as that term is defined by Section 8 and as described herein, exceed the minimums set out in that statute.

38.    Domino's describes itself as a quick service restaurant and states that: "We compete within the food service industry and the QSR sector not only for customers, but also for personnel, suitable real estate sites and qualified franchisees." Domino's 2008 10-K at 12.

39.     Domino's derives substantial revenue from the sale of sandwiches.  According to a Domino's press release issued on September 22, 2009, entitled "Domino's Adds Four New Bold Sandwiches to Its Oven-Baked Line-Up," Domino's announced "over 35 million sandwiches sold in the past year, and over $185 million in sales…."  Compared with total sales of 1.4 billion in 2008, the sale of sandwiches represents roughly 13% of Domino's total revenue.

40.     The sandwiches sold by Domino's include: Italian Sausage and Peppers; Buffalo Chicken; Chicken Habanero; Mediterranean Veggie; Philly Cheese Steak; Chicken Bacon Ranch; Italian; and Chicken Parm.  Domino's also sells an assortment of fried chicken pieces, salads, desserts and beverages.  A listing of the items sold by Domino's are available on its website at www.dominos.com.

41.     The items listed above are sold by Domino's at the same comparative prices as similar items sold by Burger King.  For example, while prices vary based on geographical location, in the United States Domino's charges: (i) $4.99 to $5.99 for its sandwiches; (ii) $3.99 to $4.99 for its salads; (iii) $6.99 to $7.49 for a variety of fried chicken pieces; (iv) $1.99 to $4.49 for deserts such as chocolate cake or "Cinna Stix"; and (v) $1.49 to $2.49 for a variety of carbonated and non-carbonated beverages.

42.     Domino's competes with other fast food restaurants that sell similar items.  For example, in late 2008 and 2009, Domino's engaged in a marketing campaign touting the results of an independent national taste test in which participants preferred Domino's sandwiches to those offered by Subway, a company that Burger King acknowledges as a competitor as alleged herein.  (The marketing campaign was created by Miami-based advertising agency Crispin, Porter + Bogusky, which also provides advertising services for Burger King).  According to an article published in Crain's Detroit Business on January 22, 2009, entitled Domino's Pizza Starts Food Fight with Subway, Defendant Brandon was quoted extensively stating:  "We don't know

11

what Subway's going to do.  If they want to further engage on this, we'll have a response . . . .
We don't mind locking horns a little bit. . . ."

43.     At least one stock analyst that follows Domino's regards Burger King as its
competitor.  For example, on January 11, 2010, Citigroup issued a report on Domino's
describing Domino's increasing sales and noting that the sales are "in contrast to what we are
seeing at other QSR companies, such as Burger King…."  Gregory R Badishkanian, Citigroup
Global Markets, Domino's Pizza Inc., Jan. 11, 2010, at 1, 3.  And in comparing Domino's
domestic SSS (same store sales) with a composite of eight "QSR competitors," the analyst report
included Burger King among the competitors.  *Id.* at 3.

44.     While Domino's does not offer dine-in areas, it describes itself on its website as a
limited service restaurant (available at www.dominos.com) and states in its public filings that it
competes with QSRs like Burger King.  For example, in its 2008 Annual Report, Domino's
states:

> U.S. and international pizza delivery and carry-out are highly competitive.
> Domestically, we compete against regional and local companies as well as
> national chains, Pizza Hut® and Papa John's®. Internationally, we compete against
> Pizza Hut® and regional and local companies. We generally compete on the basis
> of product quality, location, image, service and price. ***We also compete on a
> broader scale with quick service and other international, national, regional and
> local restaurants. In addition, the overall food service industry and the QSR
> sector in particular are intensely competitive with respect to product quality,
> price, service, convenience and concept.*** The industry is often affected by
> changes in consumer tastes, economic conditions, demographic trends and
> consumers' disposable income. We compete within the food service industry and
> the QSR sector not only for customers, but also for personnel, suitable real estate
> sites and qualified franchisees.

Domino's 2008 10-K at 12.

**B.     The Director Defendants Nominated And Endorsed An
         Illegal Interlocking Director In Violation Of Section 8**

45.     The Company's Amended and Restated Certificate of Incorporation provides that
the number of directors constituting the Board shall not be fewer than three or more than 15, with

the exact number to be fixed by a resolution adopted by the affirmative vote of a majority of the Board. The Board has fixed the number of directors at ten (10) and presently consists of ten (9) members.

### 1.    The Burger King Corporate Codes and Guidelines

46.    In nominating, endorsing and/or appointing Brandon and Pagliuca to serve on the Board in violation of Section 8, the Board and its members acted intentionally, recklessly or with gross negligence as show by the many facts alleged herein.

47.    According to Burger King's Code of Business Ethics and Conduct (the "Business Code") (available at www.bk.com):

> Everything we do should be with the highest integrity. No ethical shortcuts of any kind. Integrity and honesty are simply not optional.

Business Code at preface.

48.    According to the Company's Code of Conduct for Directors (the "Director Code") (available at www.bk.com):

> The Board of Directors ("Board") acknowledges its responsibility for promoting an ethical culture through the actions of Board members and the effective oversight of the Company's compliance programs, policies and procedures.
>
> . . . .
>
> Observing the basic principles set forth in the Company's Code of Business Ethics and Conduct ("BKC Code"), including compliance with all laws, regulations, rules, and Company policies. The Board hereby approves the BKC Code and affirms its commitment to monitor the Company's compliance programs and activities.
>
> . . . .
>
> Maintaining its loyalty to the Company and the BURGER KING® Restaurant System and avoiding any situations that create or appear to create a conflict of interest.
>
> . . . .
>
> Consulting with the Company's General Counsel or Chairman of the Board

13

regarding any questions about this Code. Directors must promptly contact
the Chairman or the General Counsel if the director believes there has been a
violation of this Code, or if he or she is aware of illegal or unethical
behavior by any employee, officer, or director, or by anyone purporting to be
acting on the Company's behalf.

Director Code at 1-2.

     49.    According to the Company's Corporate Governance Guidelines (the

"Guidelines") (available at www.bk.com):

> The Board acts as the ultimate decision-making body of the Company and advises
> and oversees management, who is responsible for the day-to-day operations and
> management of the Company.  In fulfilling this role, each director must act in
> what he or she reasonably believes to be in the best interests of the Company and
> its shareholders, and must exercise his or her business judgment. Directors will
> also, as appropriate, take into consideration the interests of other stakeholders,
> including employees and the members of the communities in which the Company
> operates.

Guidelines at 2-3.

     50.    According to the Business Code, under a section entitled Conflict of Interest:

> Being ACCOUNTABLE means making smart choices and remembering that in
> business dealings, your duty of loyalty is to the Company. This duty can be
> violated if you engage in activities that conflict with the Company's interests or
> even create a perceived conflict. A conflict may arise when you are influenced or
> even appear to be influenced by considerations of personal gain or benefit for you
> or a family member that conflict with your obligation to the Company. Conflicts
> of interest can take many forms, not all of which can be specifically mentioned
> here. The following are some examples of conflicts of interest that should be
> avoided:

> Engaging in any activity that conflicts with the Company's business, such as
> working as a consultant *or in any capacity for another quick-service restaurant
> company.*

> Having an ownership interest *or other business relationship* with a competitor,
> supplier, franchisee or distributor of the Company.

> . . . .

> Serving as an officer or *director* of, or working as an employee or consultant for, a
> *competitor*, supplier, franchisee or any other company without written approval of the
> chief ethics and compliance officer.

. . . .

You should refer to the Company's conflict of interest policy for additional examples of conflicts and guidelines on how to best handle them. Keep in mind that if it doesn't feel right, it probably isn't.

If you have any questions about a potential conflict of interest, gifts or entertainment or if you think something that you or a family member is doing may be a conflict or even be perceived as one, please contact the chief ethics and compliance officer before taking any action. All exceptions to the conflict of interest policy require advance approval of the chief ethics and compliance officer and, in some cases, the board of directors.

Business Code at 14-15, 18.

51.     According to Burger King's Business Code, under a section entitled Commercial

Transactions "Be BOLD, but Follow the Law":

Antitrust Laws and Trade Regulations: Being BOLD and ACCOUNTABLE means playing fair and square by complying with all laws in this area!

We are committed to fair competition. Driving GROWTH AND PROFITABILITY cannot take place at the expense of our commitment to comply with all antitrust and trade regulation laws. These laws are complex and evolving, and affect virtually every phase of our business, including our relationships with suppliers, distributors, competitors, cooperatives, franchisees and almost everyone with whom we deal day-to-day. Among other things, these laws prohibit us from agreeing to fix prices, including any price component such as discounts, rebates or other terms of sale, with any competitor to the BURGER KING® system. The Company also does not engage in, and will not tolerate, agreements with any competitor to the BURGER KING® system to divide the market or limit competition in certain locales.

Companies and individual employees may face fines, heavy penalties and restrictions, and in certain countries, even criminal penalties, including imprisonment for certain antitrust violations. Antitrust and trade regulation is a complex legal area, so if an activity does not "feel" right or seems inconsistent with these principles, consult an attorney in the law department before engaging in the activity.

Business Code at 33.

**2.     Board Service**

52.     According to the Company's Guidelines, Burger King does not limit the service

of Company directors to serve on the boards of other public companies.  According to the

15

Guidelines:

> The Board does not have limits on the number of other public company boards of
> directors upon which a director may sit, [except that directors serving on the
> Company's Audit Committee may not simultaneously serve on the audit
> committees of more than two other public companies,] nor does the Board have
> any retirement or tenure policies that would limit the ability of a director to be
> nominated for re-election. However, to ensure that the Board remains composed
> of high functioning members able to keep their commitments to Board service,
> the Nominating and Corporate Governance Committee will evaluate the
> qualifications and performance of each incumbent director before recommending
> the nomination of that director for an additional term.

Guidelines at 2 (alterations in original).

### 3.    The Election of Burger King's Directors

53.    The members of the Burger King Board serve one year terms.

54.    On or about October 8, 2009, Burger King disseminated to its shareholders and

filed with the SEC a definitive proxy (the "2009 Proxy") inviting Burger King shareholders to

attend the Company's annual shareholder meeting on November 19, 2009 at 9:00 a.m, at the

Hilton Miami Airport, and/or vote on, among others, the election of the Company's directors.

55.     The 2009 Proxy indicated that the Board nominated all nine then currently

serving Board members to stand for election to the Company's Board.  *See* 2009 Proxy at 10-11.

56.     While the Nominating Charter empowers the Nomination Committee to "select,

retain and terminate counsel, consultants and other experts . . . . retain a search firm to be used to

identify director candidates . . . [and] have available appropriate funding from the Company as

determined by the Committee for payment of compensation to any search firm or other advisors

retained by the Committee," Nominating Charter at 5, the 2009 Proxy does not indicate that any

such efforts were taken, or any such advisers or entities were retained, in proposing the 2009

nominees.

57.     According to the 2009 Proxy, all nine nominees were listed, along with their age,

principal occupation and other information, followed by the following endorsement from the

Board:

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE *"FOR"* THE ELECTION OF EACH OF THE ABOVE NOMINEES**

2009 Proxy at 11 (emphasis in original).

58.     The annual shareholder meeting occurred on or about November 19, 2009 at 9:00 a.m, at the Hilton Miami Airport, wherein, among others, all nine nominees, including Brandon, were elected to serve as directors of the Company.

59.     On or about January 20, 2010, the Burger King Board, upon the recommendation of the Nominating Committee, reappointed Pagliuca to serve as a Burger King director. *See* Burger King 8-K, filed on Jan. 25, 2010.  This appointment was selected by Bain pursuant to the Shareholders' Agreement. *Id.*

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties.

61.     Plaintiff owns Burger King common stock and has owned such stock at all relevant times.

62.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

63.     The Burger King Board currently consists of ten (10) directors.  These include all the Director Defendants, namely: Brandon, Pagliuca, Chidsey, Swette, Boyce, Dykes, Formanek, Garcia, Mehra and Youngblood.

64.     All ten members of the present Board committed a void and *ultra vires* act when they nominated, endorsed and reappointed for Board membership two interlocking directors in violation of Section 8 and allowed them to continue in service as Board members.  The nomination, endorsement and reappointment of interlocking directors are per se violations of the

17

U.S. antitrust laws.  Such actions are beyond the authority of any board member and cannot be ratified by the Company's shareholders.  These actions are thus void and *ultra vires*. Accordingly, in these circumstances – when allegations of *ultra vires* board action have been made – the law of the state of Delaware clearly states that a pre-suit demand "will be excused if a majority of the board that allegedly pursued the *ultra vires* action remains on the defendant board at the time demand is made." *In re InfoUSA, Inc.*, 953 A.2d 963, 988 (Del. Ch. 2007).

65.    Because a majority of the Board (indeed, the entire Board) committed these *ultra vires* acts a pre-suit demand is excused and no further analysis or allegation concerning Defendants' wrongdoing, mental state or culpability is required to excuse such pre-suit demand. Nevertheless, it is clear that the current Board members were knowingly and/or recklessly indifferent to their Section 8 violations and acted with intent, gross negligence and/or bad faith when they nominated and endorsed an illegal interlocking director to serve on Burger King's Board.  Evidence of Defendants' culpable wrongdoing is substantial:

a)    First, the Board knowingly, intentionally, recklessly or with gross negligence nominated an individual that simultaneously sits on the boards of competing companies.  Indeed, the Board knew that Brandon sits on the board of Domino's.  That knowledge is based on the Company's own public filings which indicate that Brandon is a sitting director of Domino's.  The Board also knew that Pagliuca was selected by Bain, an entity that has two deputized agents sitting on the board of Domino's.  That knowledge is based on the Company's own public filings which indicate that Pagliuca was selected by Bain and from the fact that Pagliuca is a Managing Director of Bain.  Also, the Board knew that Burger King competes with Domino's.  That knowledge is based on the Company's own public filings which indicate that Domino's is regarded by the Company as a peer in the restaurant business.  All of the Director Defendants (except Mehra who did not attend at least 75% of the Board's meetings

for fiscal 2008) signed the Company's 2009 Annual Report which listed Domino's as a "peer company" and other quick service restaurants, such as Pizza Hut, as competitors. *See* Burger King 2008 10-K at 121.  In addition, Defendant Chidsey's own employment agreement contains a non-compete clause forbidding him from working for a "quick serve restaurant" for one-year following termination from Burger King.  Accordingly, the instant violations were done knowingly, intentionally, recklessly or with gross negligence.

        b)     Second, the Board plainly failed to properly inform itself of the applicable laws and acted with gross negligence or intentionally.

        c)     Third, by nominating and reappointing illegal interlocking directors, the Board failed to abide by their duty of loyalty to act solely in the best interest of the Company. The Board failed to address the inherent conflict of interest that arises when one individual serves on the boards of two or more competing companies.  By doing so, they not only violated their duty of loyalty, but their own corporate governance codes and guidelines which prohibit illegal and anti-competitive behavior.

66.     In light of the foregoing, a pre-suit demand is excused.

## COUNT ONE

## VIOLATION OF SECTION 8 OF THE CLAYTON ACT

67.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

68.     Section 8 of the Clayton Act, 15 U.S.C. § 19, prohibits a person from serving, at the same time, as a director or officer of two or more corporations, other than banks, banking associations, and trust companies if: (1) the combined capital, surplus and undivided profits of each of the corporations exceeds $10,000,000 (or as of January 19, 2010, $25,841,000); (2) each corporation is engaged in commerce; and, (3) the corporations are competitors. Burger King and Domino's meet these statutory requirements and none of the exemptions from Section 8 apply

here.

69.     Brandon currently serves as a director of both Burger King and Domino's and is in violation of Section 8 because:

        a)      Burger King and Domino's each have a combined capital, surplus and undivided profit exceeding $25,841,000.

        b)      Burger King and Domino's are each engaged in commerce.

        c)      Burger King and Domino's are competitors, such that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws. Pursuant to 15 U.S.C. § 26, Brandon should be enjoined from continuing to serve on the boards of both companies, namely Burger King and Domino's.

70.     Bain (through its deputized agent Pagliuca) currently serves as a director of both Burger King and Domino's and is in violation of Section 8 because:

        a)      Burger King and Domino's each have a combined capital, surplus and undivided profit exceeding $25,841,000.

        b)      Burger King and Domino's are each engaged in commerce.

        c)      Burger King and Domino's are competitors, such that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws. Pursuant to 15 U.S.C. § 26, Pagliuca (as the deputized agent of Bain) should be enjoined from continuing to serve on the boards of both companies, namely Burger King and Domino's.  In addition, Bain should be enjoined from replacing Pagliuca with another interlocking director.

71.     Burger King and Domino's exceed the statutory minimums contained in 15 U.S.C.  § 19(a)(2)(A)-(C) in that: (a) the competitive sales of each of the four corporations is greater than $1,000,000 (or as of January 19, 2010, $2,584,100); (b) the competitive sales of each of corporation is greater than 2% of each corporation's total sales; and, (c) the competitive

sales of at least one of the two corporations is greater than 4% of that corporation's total sales.

72.     As a result of the foregoing, the Director Defendants and Bain violated Section 8 by nominating, endorsing, selecting and/or reappointing illegal interlocking directors to serve on the Burger King Board.

73.     The Court should: (i) issue an injunction requiring Burger King to remove Brandon and Pagliuca (in addition to Bain and any agent of Bain) from the Board, or to otherwise cure the present violation of Section 8; (ii) enjoin Brandon and Pagliuca (in addition to Bain and any agent of Bain) from continuing to serve on the Burger King Board; or, (iii) enjoin Burger King and/or the Burger King Board (as presently constituted and as it may be constituted in the future) from committing future violations of Section 8 because, for the reasons stated above, there is a strong likelihood of continued violations of Section 8.

**COUNT TWO**

**BREACH OF FIDUCIARY DUTY**

74.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

75.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith and loyalty to ensure that Burger King was operated in a diligent, honest and prudent manner and complied with all applicable federal laws.

76.     The Defendants knowingly and/or recklessly, and in violation of their duty of loyalty, violated Section 8 when they nominated and endorsed for re-election Brandon to the Burger King Board and reappointed Pagliuca to the Burger King Board.  In doing so, the Defendants breached their fiduciary duties to Burger King and its shareholders, namely, the duties of due care, good faith, candor, and loyalty.

77.     Furthermore, despite their actual knowledge of the Company's improper business practices, the Defendants have made no effort to correct the problems and have thus allowed

Brandon to continue to serve on the Board in violation of Section 8. The Defendants exacerbated the pre-existing and ongoing violation by selecting and reappointing Pagliuca to the Board. Accordingly, the Defendants have abdicated their fiduciary duty of good faith.

78.     As a direct and proximate result of the Defendants' breaches of fiduciary duties, they have violated and caused the Company to violate Section 8. The Burger King Board should be enjoined from violating Section 8. Alternatively, the Court should enjoin Brandon and Pagliuca (including Bain and any agent of Bain) from continuing to serve as a director on the Burger King Board. The Court should issue an injunction requiring the Burger King Board to remove Brandon and Pagliuca (including Bain and any agent of Bain) from the Burger King Board, or to otherwise cure the present violation of Section 8. The Court should also issue an injunction barring the Burger King Board (as presently constituted and as it may be constituted in the future) from all future violations of Section 8 because, for the reasons stated above, there is a strong likelihood of continued violations of Section 8.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands:

A.     That the Burger King Board (as presently constituted or as it may be constituted in the future) be preliminarily and permanently enjoined such that the Board is directed to remove the subject interlocks or otherwise cure the violation by requiring the subject interlocks to resign from their directorships on the board of Domino's. Alternatively, Plaintiff demands that the Court enjoin Brandon and Pagliuca (including Bain and any agent of Bain) from continuing to serve as a director on the Burger King Board.

B.     That the Defendants be preliminarily and permanently enjoined from future violations of Section 8 and that the Burger King Board be ordered to establish a procedure whereby future elections and appointments of officers and directors in violation of Section 8 are

identified and restricted.

C.    That the Court award Plaintiff the cost of this suit, including reasonable attorneys'

fees as authorized under 15 U.S.C. § 26 and the common law, and

D.    That the Court order such other and further relief as may appear necessary and

appropriate.

Dated: February 24, 2010          **VIANALE & VIANALE LLP**

                                   Kenneth J. Vianale
                                   (Fla. Bar No. 169668)
                                   2499 Glades Road, Suite 112
                                   Boca Raton, Florida 33431
                                   T: 561-392-4750
                                   F: 561-392-4775

                                   **SARRAF GENTILE LLP**
                                   Ronen Sarraf
                                   Joseph Gentile
                                   116 John Street, Suite 2310
                                   New York, New York 10038
                                   T: 212-868-3610
                                   F: 212-918-7967

                                   ***Counsel for Plaintiff***

23

## Verification

Pursuant to 28 U.S.C. § 1746 and the requirements of Federal Rule of Civil Procedure 23.1, the undersigned verifies under penalty of perjury that the statements set forth in the foregoing VERIFIED DERIVATIVE COMPLAINT are true and correct to the best of his knowledge.

Date: February *18* 2010                    BELLE COHEN

                                            By: *Belle Cohen*
                                            Belle Cohen